# EXHIBIT A

AGREEMENT 4101003325 PAGE 27

## ATTACHMENT 6

PATENT AND KNOW-HOW LICENCE AGREEMENT

This License Agreement is entered into as of the last date signed below by and between: Mannesmann Dematic Rapistan Corporation, having its principal place of business at 507 Plymouth Avenue NE, Grand Rapids, MI 49505-6098, USA, hereunder referred to as "Rapistan", and Alcatel Postal Automation Systems, a company existing under the laws of France and having its principal place of business at 14, Avenue Raspail, 94250 Gentilly, France, hereunder referred to as "APAS".

WITNESSETH:

Whereas, the United States Postal Service ("USPS") awarded APAS a sole source contract No. 102590.98.0.1235, (the "Kearny Contract") by for the purchase and operational maintenance of the Top Flat Sorting Machine ("Top FSM") installed and operational in the Kearney Facility, New Jersey beginning in February 1997;

Whereas, the USPS evaluated the Top FSM and determined that the productivity gains and return on investment implicit in acquiring sorting systems that incorporate more recent technology, justified the USPS's acquisition in production quantities of such systems, called the Next Generation Flat Sorting Machines ("NGFSM") from qualified sources following field tests conducted pursuant to competitive test contracts, such acquisition to be concluded following a competitive tendering exercise (the "Production RFQ");

Whereas, the USPS qualified APAS to participate in and has awarded APAS a competitive test contract (the "Competitive Test Contract") using the Top FSM installed under the Kearny Contract, with certain modifications;

Whereas, APAS desires to partner with Rapistan for the purposes (i) of meeting its contractual obligations under the Kearny Contract and under the Competitive Test Contract, and (ii) of responding to the Production RFP, and APAS is prepared in this connection to license to Rapistan APAS's Top FSM technology;

Whereas, Rapistan is likewise involved in the field of mail sorting automation equipment and desires to partner with APAS for the purpose of replying to the Production RFP and, if successful, performing the resulting contract with the USPS (the "USPS Contract");

Whereas, APAS is the owner of the technical data, know how, patents and information relating to the Top FSM; and warrants that it has the right to enter into license agreements for the manufacture of the Top FSM; and

Whereas, APAS and Rapistan entered into a teaming agreement (the "Teaming Agreement") dated April 1, 1998, reference NGFSM, regarding the submission of a bid in reply to the Production RFP on the basis that Rapistan would act as the prime contractor under the USPS Contract, and APAS would act as sub-contractor to Rapistan;

12/22/98

Now therefore, in consideration of the premises hereinafter recited, and for other good and valuable considerations, the parties agree as follows:

## ARTICLE 1 - DEFINITIONS

The following terms, not elsewhere defined in this Agreement, shall have the following meanings:

1.1 "Top FSM" shall mean the Top model of Flat Sorting Machine designed by APAS using APAS proprietary technology.

1.2 "NGFSM" shall mean the new generation of Flat Sorting Machines that the US Postal Service anticipates purchasing in production quantities based on price and performance runs measured during Competitive Testing.

1.3 "Competitive Test" shall mean the testing of vendor machines and measurement of performance runs by the US Postal Service. APAS has been awarded Contract N° 102590-98-0-1235 for the testing of the Top FSM installed at the Kearney Facility, New Jersey.

1.4 "Production RFP" shall mean the request for proposal N°102590-98-A-0047 issued by the US Postal Service to initially buy 175 NGFSM units with provisions for future optional orders of up to 850 NGFSM units.

1.5 "Patents" shall mean Alcatel patented information used in the design of the NGFSM.

1.6 "Technical Information" shall mean APAS's technical data, manufacturing documentation, know-how and related proprietary information necessary to enable Rapistan to test and manufacture NGFSM units. Technical information shall include manufacturing drawings, parts lists, test instructions, schematics and field installation instructions, firmware, software, source code, flow charts, diagrams, executable code and copyrighted data. This documentation may be reproduced by Rapistan, and if reproduced, each copy shall be returned to APAS upon the expiration or earlier termination of this License Agreement.

## ARTICLE 2 - DATA RIGHTS

The Technical Information, as supplied to Rapistan by APAS and any subsequent improvements made by either Rapistan or APAS, shall at all relevant times be and remain the property of APAS.

## ARTICLE 3 - LICENSES

3.1 APAS hereby grants, subject to the further terms of this Agreement, to Rapistan and Rapistan hereby accepts from APAS, the non-exclusive, non-transferable (except as required under the USPS contract in which case the license may be transferred with restricted technical data rights to the USPS), limited license to use and modify the Technical Information only for the following purposes:

12/22/98

    (a) to prepare and submit Rapistan's response to the Production RFP;
    (b) in the event Rapistan is awarded the USPS Contract, to manufacture NGFSM units only as required under and in strict compliance with the terms of the USPS Contract and any subsequent contracts with the USPS for NGFSM units ("Subsequent Contracts") in Rapistan's own manufacturing facilities located in the United States of America; and
    (c) to test and install such NGFSM units at USPS-designated sites.
    (d) for development, production, support, simulators, training and documentation.
    (e) for all option quantities.

3.2 APAS grants to Rapistan, with effect from the time Rapistan is awarded the USPS Contract, a non-exclusive, non-transferable license to exercise the Patents for the sole purpose of performing the USPS Contract and Subsequent Contracts, subject to the further terms of this Agreement.

3.3 All license rights granted herewith by APAS are restricted to only those rights necessary to reply to the Production RFP and fulfill the obligations of the USPS Contract and Subsequent Contracts.

3.4 The present license does not include the right of Rapistan to develop or modify the Technical Information or the NGFSM in any manner without the prior written consent of APAS.

3.5 The license may not be further sublicensed or assigned in any manner by Rapistan except to the extent that Rapistan is required under the USPS Contract to subcontract all or any part of the manufacture of NGFSM units, in which event Rapistan may sublicense the license with the prior written consent of APAS, which consent shall not be unreasonably delayed or withheld. However, such consent may be subject to the written agreement of such sublicensees to the same restrictions on the use of Technical Information as are contained in this License Agreement.

## ARTICLE 4 - NAMEPLATE

Rapistan is entitled and obligated to affix to all NGFSM units manufactured in accordance with this License Agreement, the designation "Manufactured by Mannesmann Dematic Rapistan Corp. under license by Alcatel Postal Automation Systems" or as otherwise prescribed from time to time by APAS.

## ARTICLE 5 - SUPPLY OF TECHNICAL INFORMATION

5.1 APAS will provide Rapistan with one complete set of Technical Information for Rapistan's proposal in response to the Production RFP.

5.2 APAS will provide pre-award technical assistance to Rapistan, as described in Exhibit 4 to the Bidding Agreement, in connection with Rapistan's proposal, however, APAS shall not in any way be

12/22/98

responsible for Rapistan's proposal or pricing. Rapistan shall exercise its own independent judgment and shall remain ultimately responsible regarding its proposal and pricing. APAS shall provide such assistance as may be reasonably required from the date of the issuance of the USPS request for quotation until the date of award.

5.3 During the pre-award period, Rapistan may request that APAS's engineers visit Rapistan's site to provide assistance. Rapistan shall pay APAS's reasonable expenses for such assistance.

5.4 If and when the Contract is awarded to Rapistan, Rapistan may obtain further technical assistance from APAS at the prevailing normal and customary rate charged by APAS for similar services, the amount to be ascertained at the time such assistance is requested. APAS guarantees the reasonable availability of such technical assistance for the term of this License Agreement.

5.5 APAS will provide to Rapistan's qualified experts access to those areas of APAS's factories which are engaged in the commercial production of NGFSM units in order to provide those experts the opportunity to receive technical assistance in connection with the manufacture of NGFSM units. The time and extent of this access shall be mutually agreed upon in advance by the Parties. The costs and expenses incurred by APAS in connection with such access and assistance will be calculated in accordance with the prevailing normal and customary rate for similar services provided by APAS at the time of delegation. At Rapistan's request, APAS is also prepared to send its own experts to Rapistan's specified location for the purpose of advising its personnel. Charges will be invoiced by APAS to Rapistan separately and Rapistan shall pay such invoices within thirty (30) days after the date of the relevant invoice, except as may be otherwise stated in APAS's submission to Rapistan in connection with the Production RFP.

5.6 The assistance provided in accordance with paragraphs 5.1, 5.2, 5.3 and 5.4 above will generally be given in English.

5.7 APAS has design authority for NGFSM units manufactured under this License Agreement. Rapistan shall obtain APAS's prior written approval prior to implementing any changes required by the USPS. If Rapistan requests such modification, Rapistan shall demonstrate to APAS the technical equivalence of such modification to the satisfaction of APAS.

ARTICLE 6 - LIABILITIES OF APAS

6.1 APAS DOES NOT WARRANT THAT THE NGFSM UNITS MANUFACTURED BY RAPISTAN WILL MEET THE STANDARDS SET FORTH IN THE PRODUCTION RFP.

12/22/98

APAS WARRANTS ONLY THAT THE TECHNICAL INFORMATION WILL ALLOW THE NGFSM UNITS TO BE MANUFACTURED IN CONFORMITY WITH THE NGFSM PERFORMANCE AND RELIABILITY STANDARDS AS SET FORTH IN THE PRODUCTION RFP.

6.2 In providing Technical Information, APAS will take the same care as APAS employs in its own business. In the event that discrepancies or errors are found in the Technical Information which affect the production or assembly of NGFSM units, Rapistan will contact APAS for further assistance to solve the problem. If such documentation should prove incorrect or incomplete, APAS shall correct the mistake or supply missing documentation without delay, at no charge to Rapistan. APAS's LIABILITY IN THE EVENT OF SUCH DISCREPANCY OR ERROR SHALL BE LIMITED TO THE UNLOADED DIRECT MATERIAL COST FOR THE FIRST NGFSM PRODUCTION UNIT.

6.3 APAS MAKES NO REPRESENTATIONS OR WARRANTIES THAT THE NGFSM WILL MEET OSHA OR OTHER FEDERAL, STATE AND LOCAL RULES AND REGULATIONS IT BEING EXPRESSLY UNDERSTOOD THAT RAPISTAN AT ITS EXPENSE SHALL BE SOLELY RESPONSIBLE FOR INSURING THAT THE NGFSM MEETS SUCH STANDARDS.

ARTICLE 7 - OTHER OBLIGATIONS OF RAPISTAN

7.1 Rapistan shall provide APAS with one copy (in draft form, as appropriate) of all documentation deliverables required under the USPS Contract. The timetable for delivery of such items shall be agreed between the Parties.

7.2 Within thirty (30) days of the end of each calendar quarter, Rapistan shall submit to APAS a duly signed statement noting the number of NGFSM units delivered to the USPS during that quarter. Such statement shall include, at minimum, the site name, serial number, site finance number and the date of USPS acceptance of each NGFSM unit.

7.3 Rapistan shall provide APAS access to its personnel and facilities to verify work in connection with the manufacture of the NGFSM and access to its records to verify delivery and USPS acceptance of the NGFSM units, at any time prior to two years following the expiration or earlier termination of this License Agreement.

ARTICLE 8 - CONFIDENTIALITY

8.1 The term "Confidential Information" means any oral or written information, including, but not limited to, Technical Information, business plans, market information, technical data, trade secrets,

12/22/98

inventions, formulae, procedures, patterns, programs, devices, techniques, processes, know-how, methods, discoveries, ideas, concepts, software in various stages of development, designs, drawings, specifications, models, data source code, object code, documentation, diagrams, flow charts, research, development marketing techniques and material, marketing and development plans, customer names and other information related to customers, price lists, pricing policies, financial information, and current and accumulated skills and experiences, and the like, which are related to the development, manufacture, installation, operation, modification and maintenance of NGFSM units and which are not in the public domain. "Confidential Information" includes information disclosed in written form or other tangible form identified by a marking thereon as proprietary or confidential, and oral information which is identified as proprietary at the time of disclosure and confirmed in writing, as being confidential, within ten (10) days of its disclosure.

8.2 Rapistan's Responsibilities of Non-Disclosure.
Rapistan:
  (a) shall maintain the confidentiality of, and shall not disclose to any third party at any time or in any manner, any Confidential Information or any information derived therefrom that is provided or known to Rapistan except that information shall not be deemed confidential if it:
    (i) is or becomes part of the public domain without breach of this License Agreement;
    (ii) is or becomes available to Rapistan from third parties who have received such information from APAS without restriction on further disclosure;
    (iii) is already known to Rapistan as evidenced by tangible written evidence in the files of Rapistan;
    (iv) is publicly disclosed with the prior written approval of APAS; or
    (v) was independently developed by an employee of Rapistan prior to the receipt thereof, providing the employee did not have access to the disclosed information and such independent development is substantiated by reasonable documents, such as a filed patent application.
  (b) shall not use the Confidential Information and any information derived therefrom in any manner except as described herein;
  (c) shall limit access to Confidential Information to those of its directors, officers, employees, subcontractors and suppliers who necessarily require such Confidential Information in order to carry out their respective duties in

12/22/98

connection with this License Agreement and the USPS Contract; and

(d) shall disclose such Confidential Information to such persons subject to the restrictions as to its use as set out in this Agreement, and shall ensure that each such person shall observe such restrictions through the implementation of procedures that would be employed by a reasonable and prudent person to safeguard the confidentiality of its most confidential information.

## ARTICLE 9 - TERM AND TERMINATION OF THE AGREEMENT

9.1 This License Agreement shall become effective upon signature by both parties.

9.2 This License Agreement shall terminate upon the earliest of the following events to occur:

(a) the USPS elects not to select APAS NGFSM design, or cancels the Production RFP;
(b) Rapistan is not awarded the USPS Contract;
(c) Rapistan completes all of its obligations under the USPS Contract; or
(d) the USPS Contract is terminated by the USPS.

Within thirty (30) days after the termination of this License Agreement, Rapistan shall surrender and deliver to APAS, and shall retain one copy for archival purposes, any and all Confidential Information, and shall deliver appropriate attestations of corporate representatives demonstrating that this sub-paragraph has been fully complied with. Notwithstanding expiration of this License Agreement, Rapistan shall not disclose Confidential Information for a period of five (5) years from the termination of this License Agreement.

## ARTICLE 10 - PAYMENT ROYALTIES AND AUDIT

10.1 Flat Fee
If Rapistan is awarded the USPS Contract, Rapistan will pay to APAS the sum of US$1,500,000.

10.2 Royalties for NGFSM produced under the USPS Contract
5000 $ per machine

10.3 Royalties for NGFSM produced under Subsequent Contracts
5000 $ per machine

## ARTICLE 11 - CERTAIN REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

11.1 Certain Representations and Warranties
Each party hereby represents to the other that it has full

12/22/98

authority to enter into this License Agreement and that the representatives signing this Agreement have been duly empowered. APAS represents that it has full title to any and all Technical Information. APAS further warrants that it developed the NGFSM design without aid or assistance from outside parties and that the design of the NGFSM is original.

11.2 Indemnification

(a) Except for the intellectual property infringement claims covered by Section 11.2 below, each party will at all times indemnify, defend and hold the other harmless from all actions, suits, proceedings, losses, costs, damages, charges, claims and demands in any way arising out of or by reason of anything done or omitted to be done by its personnel, including, without prejudice to the foregoing generality, any claims which the said personnel or their legal representatives may make for loss or damage to their persons or property.

(b) In no event shall either party be liable for consequential or incidental damages for breach of this agreement.

11.3 Defense and Indemnification for Infringement Claims

(a) Rapistan agrees to protect the Technical Information and Patents from infringement action by infringers. In the event that Rapistan shall become aware of any infringement of any NGFSM patent, it shall notify APAS and if APAS does not undertake to protect said NGFSM patent, Rapistan shall be entitled by itself to initiate proceedings in the name of, and with the approval of, APAS to restrain such infringement at Rapistan's own expense and account; any damages and costs recovered shall in such case be the property of Rapistan. APAS shall be entitled to be represented at such proceedings by its own counsel at its own expense. Rapistan shall have the sole control of defense of any infringement claim at its option, and APAS will co-operate in such defense.

(b) In the event claims are made against APAS for the infringement of any patents or copyrights of third parties for articles manufactured under the license granted herein, the cost of defending against such claims shall be equally shared by APAS and Rapistan. However, if such third party claim shall be upheld by a court of competent jurisdiction, APAS shall be responsible for any damages awarded by such court.

11.4 Damages for Breach

A breach by Rapistan of any of the provisions of this License Agreement entitle APAS to seek immediate injunctive relief in a court or agency of competent jurisdiction, including recovery of reasonable attorney's fees and actual damages awarded by such court or agency.

12/22/98

## ARTICLE 12 - GENERAL PROVISIONS

12.1 Amendments - Any revision, amendment or change to this License Agreement may only be made by a formal written amendment signed by the duly authorized representatives of each party.

12.2 Governing Law - This License Agreement shall be governed and construed in accordance with the laws of the State of New York. Both parties hereto consent to the service of process in the State of New York and personal jurisdiction of the United States District Court for the Southern District of New York with respect to any litigation between the parties hereto in connection with this License Agreement.

12.3 Assignment - This License Agreement may not be assigned or delegate in whole or in part by either party without the prior written consent of the other party. Such consent shall not be unreasonably withheld. Notwithstanding the foregoing, either party may assign with notice to the other party its rights and obligations under this License Agreement to a parent or subsidiary of such party without the other party's consent so long as such assignee assumes in writing all of the assigning party's obligations hereunder, and the obligations of the assignee are guaranteed by the assignor.

12.4 Waiver - Failure of either party at any time or from time to time to exercise any of its rights under this License Agreement or to insist upon strict performance or the other party's obligations hereunder shall not be deemed a waiver or limitation of any such rights or obligations with respect to any subsequent occurrence.

12.5 Headings - The headings of Articles and Sections of this License Agreement have been inserted for convenience of reference only, are not to be considered a part hereof, and in no way modify or restrict any of the terms or provisions hereof.

12.6 Interpretation - No provision of this License Agreement shall be interpreted or construed against any party because that party or its legal representative drafted it.

12.7 Severability - If any provision of this License Agreement is held invalid or unenforceable, the remaining provisions shall continue to be valid and enforceable as though the invalid or unenforceable provisions had not been included herein. In the even that a court declares that any provision of this License Agreement is too broad to be reasonable or enforceable, such provision shall be enforced to the extent that such court deems reasonable and enforceable.

12.8 Breach of Agreement - If either party breaches this License Agreement, nothing in this License Agreement shall preclude either party from utilizing any remedy existing at law or equity.

12.9 Notices - All notices required or provided for herein shall be delivered in person or by facsimile, with confirmation of receipt requested, addressed as follows:

12/22/98

(a) If to Rapistan:
    507 Plymouth Avenue NE Grand Rapids, MI 49505-6098 USA
(b) If to APAS
    14, Avenue Raspail 94250 Gentilly, France
    or at such other address or facsimile number as such party shall designate by written notice to all other parties. All notices shall be deemed received when actually received or when receipt or facsimile is confirmed to the sending party.

IN WITNESS WHEREOF the parties hereto have executed this License Agreement as of the date first written above.


**Rapistan Corporation**

By: Vincent P. Papa

Title: Sr. Subcontracts Administrator


**Alcatel Postal Automation Systems**

By: Pierre André BARRIERE

Title: Chairman C. E. O.


12/22/98